# Exhibit A

ELECTRONICALLY FILED - 2022 Jun 17 2:11 PM - CHARLESTON - COMMON PLEAS - CASE#2022CP1002740

| | |
|---|---|
| STATE OF SOUTH CAROLINA ) | IN THE COURT OF COMMON PLEAS |
| ) | FOR THE NINTH JUDICIAL CIRCUIT |
| COUNTY OF CHARLESTON ) | |
| ) | CASE NO.: 2022-CP-10- |
| Amanda Capone, ) | |
| ) | |
| Plaintiff, ) | **SUMMONS** |
| ) | |
| vs. ) | **(Jury Trial Demanded)** |
| ) | |
| Town of Sullivan's Island, ) | |
| ) | |
| Defendant. ) | |

TO:   THE ABOVE-NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a copy of which is herewith served upon you, and to serve a copy of your pleading to said Complaint upon the subscribers at their offices at 2036 eWall Street, Mt Pleasant, SC 29464, within 30 days after the service hereof, exclusive of the day of such service, and if you fail to answer the Complaint within the time aforesaid, Plaintiff will apply to the Court for judgment by default for the relief demanded in the Complaint.

**McCULLOUGH KHAN APPEL**

s/Clayton B. McCullough
Clayton B. McCullough, Esq. (SC Bar No.13722)
Forrest Lewis, Esq. (SC Bar No. 105525)
2036 eWall Street
Mount Pleasant, SC 29464
(843) 937-0400
(843) 937-0706 (fax)
clay@mklawsc.com
forrest@mklawsc.com

**Counsel for Plaintiff**

June 17, 2022
Mount Pleasant, South Carolina

ELECTRONICALLY FILED - 2022 Jun 17 2:11 PM - CHARLESTON - COMMON PLEAS - CASE#2022CP1002740

| | |
|---|---|
| STATE OF SOUTH CAROLINA ) | IN THE COURT OF COMMON PLEAS |
| ) | FOR THE NINTH JUDICIAL CIRCUIT |
| COUNTY OF CHARLESTON ) | |
| ) | CASE NO.: 2022-CP-10- |
| Amanda Capone, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **COMPLAINT** |
| ) | |
| Town of Sullivan's Island, ) | **(Jury Trial Demanded)** |
| ) | |
| Defendant. ) | |

Plaintiff Amanda Capone, complaining of Defendant Town of Sullivan's Island, would respectfully show unto this Court the following:

## PARTIES

1. Plaintiff Amanda Nichole Capone (hereinafter "Capone" or "Plaintiff") is a citizen and resident of Charleston County, South Carolina.

2. Defendant Town of Sullivan's Island (hereinafter "Town" or "Defendant") is the appropriate Defendant in this action under S.C. Code Ann. § 15-78-40 and § 15-78-78 (c). The Town is a municipal corporation domiciled in Charleston County, South Carolina.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over all parties named in this action and over the subject matter of this action pursuant to S.C. Code Ann. § 15-78-100, South Carolina Tort Claims Act.

4. Venue in this matter is proper in this Court because the events, acts, actions, and incidences complained of herein all took place in Charleston County, South Carolina.

## FACTS

5. In January 2019, Capone was hired by the Town of Sullivan's Island Police Department as a code enforcement officer. Capone's duties included enforcing town ordinances, managing business licenses, and administering permit violations.

6. Although employed by the Police Department, Capone was put under the supervision of Deputy Town Administrator, Jason Blanton ("Blanton") who oversaw the Town's financing and business license administration.

7. Capone is openly homosexual and is happily married to another woman. Upon information and belief, Capone was the first and only openly homosexual employee to ever work for the Town.

8. Approximately two months after Capone started her employment, and despite timely submitting her biography to Employee #1 who is in charge of general administrative support, Capone was still not listed on the Town's website as an employee like the rest of her co-workers.

9. A meeting was held among Capone, Employee #1, and Blanton with the Chief of Police, Chris Griffin, to determine why Capone was not added to the Town's website. A heated discussion occurred, wherein Employee #1 was supported by Blanton for not adding Capone to the website. Ultimately, the meeting resulted in Capone being added to the Town's website.

10. In the fall of 2019, Capone was enrolled in the Police Academy to become a certified police officer. While her duties would remain the same, graduating from the Police Academy allowed her to perform her administrative duties and fill-in on patrol when needed.

11. In January 2020, after graduating from the Police Academy, Capone took over the purchase orders and Police Department's budget, in addition to her code enforcement and police duties. This required Capone to work more directly with Blanton, as he was in charge of the Town's finance and business license administration.

12. Starting in Summer 2020, while Capone was in meetings with Blanton and other members of the Town's staff, Blanton would frequently stop the work-related conversations to ask Capone how she and her wife have sex.

13. Often, these conversations occurred in front of Employee #2, a fellow police department employee, and Chief Griffin. These conversations occurred on multiple occasions over the course of Capone's employment and led her to feeling significantly uncomfortable working for the Town, particularly in reporting to Blanton.

14. Blanton appeared to have an obsession with Capone and her wife's personal life. Blanton would text Capone, telling her to come into his office alone. Capone would attempt to bring Employee #2 in with her, but often had to enter Blanton's office alone.

15. In these private meetings with Capone, Blanton would often remark how Capone looked good in her uniform, and he would lick his lips, causing Capone to feel even more uncomfortable. Capone felt preyed on by Blanton while working for the Town.

16. Capone attempted to resolve the ongoing harassment and workplace misconduct by discussing the situation with Employee #2 and Chief Griffin on multiple occasions.

17. In the fall of 2020, Blanton's workplace misconduct and harassment worsened. One afternoon while in Blanton's office with Employee #2, Blanton asked Capone specifics about her sex life with her wife. In this same meeting, Blanton asked if another female patrol officer was Capone's type and said he wanted to watch her and Capone make out.

18. During a separate meeting in fall of 2020, Capone was alone in Blanton's office when his wife called him. Blanton told his wife Capone was in his office with him, and Capone overheard Blanton's wife say something inappropriate. When Capone asked if she heard the statement correctly, Blanton confirmed she had, in fact, heard it correctly and proceeded to laugh.

19. Also in the fall of 2020, the Town tasked Blanton to purchase outdoor exercise equipment for the Town Park. Blanton called Capone's wife, who was a salesperson for a fitness equipment company. During Blanton's call with Capone's wife, Blanton did not ask about fitness equipment. Rather, Blanton only asked what it was like to be married to, and live with, Capone. He asked Capone's wife to come meet him the following day, presumably to discuss the exercise equipment. Capone asked her wife to refrain from meeting him after finding out the nature of her phone call with Blanton.

20. While Capone and her wife were attempting to have a child together and exploring Intrauterine Insemination ("IUI"), Blanton offered to donate his sperm to Capone and her wife. Blanton said he would love to be involved in their attempts to have a child together. Blanton told Capone to not waste any time or money trying IUI because he would be happy to inseminate her wife.

21. Blanton would continuously text Capone and ask her to come to his office alone. If Capone did not see Blanton for a while, he would tell her he missed her and ask her to come to his office alone to catch up.

22. Blanton's words and actions persisted and made Capone feel extremely uncomfortable and prayed upon while working for the Town. Capone felt she had to adhere to his requests, given his position in the Town and the fact that he was Capone's supervisor. Blanton would frequently assure Capone he would "take care of [her]."

23. In the fall of 2020, a member of the Police Department approached Capone asking if she would go on the record to allege sexual harassment against Chief Griffin, as there had been rumors around the Department regarding such accusations. Capone asked if Blanton had anything

to do with this request. Blanton had been speaking to several women in the Town that had alleged experiences with Chief Griffin.

24.     During this time, Blanton called Capone approximately ten (10) times per day trying to force her to speak with Andy Benke ("Benke"), the Town's Administrator, to assert allegations against Chief Griffin. Blanton promised Capone he would relocate her to Town Hall staff in exchange for her asserting allegations against Chief Griffin.

25.     This continual harassment forced Capone to call in sick one day because she was throwing up the previous night as a result of the stress caused by Blanton.

26.     In the fall of 2020, Benke spoke with Capone about Chief Griffin and Blanton. Capone informed Benke of Blanton's continued harassment and workplace misconduct. Capone detailed how Blanton would not stop harassing her, calling her several times in a row, and texting her repeatedly. Rather than appearing concerned about Blanton's conduct, Benke appeared to be amused by this and even laughed. Blanton's harassment of Capone continued.

27.     Between the fall and winter of 2020 and 2021, Capone tried to distance herself from Blanton, but Blanton continued to send Capone text messages which went unanswered by Capone.

28.     In January and February of 2021, police staff told Capone she was being recommended for a promotion to Sergeant. In the past, the Police Department did not have a protocol for promotions – they were typically just recommended by existing Sergeants and the Captain.

29.     During this time, Capone was told that she would have to go through an outside interview board and an exam for the promotion. Capone met with Benke about this in his office to ask about the process and voiced her concern that there had never been "hoops" to jump through for a promotion. Captain Chris Wallace very publicly supported Capone's promotion.

30. On April 19, 2021, Capone and her wife began In-Vitro Fertilization ("IVF"). Blanton became aware of this through Capone's payroll request for a paid sick day, and he asked Capone how much IVF cost. When Capone told him it cost approximately $15,000, Blanton responded with a smile and a wink, saying he could inseminate Capone's wife for free.

31. This exchange left Capone feeling disgusted and sick to her stomach while at work.

32. Later on April 19, 2021, Capone reviewed her pay stub and noticed her pay was less than expected. When questioned, Blanton said this was because she took a sick day, for procedures relating to IVF, without approval. Capone explained she did get approval from Chief Griffin, but Blanton insisted on meeting with Capone alone, without Chief Griffin present. Capone explained Chief Griffin needed to be present, as he approved her paid time off request, but Blanton continued to insist that Capone come alone.

33. Capone asked Chief Griffin to accompany her to her meeting with Blanton to discuss the pay issue. Capone felt uncomfortable discussing the issue alone with Blanton in his office and requested Blanton attend the meeting in Chief Griffin's office. Reluctantly, Blanton obliged. Blanton and Chief Griffin argued over Capone's pay stub issue, which ultimately resulted in Capone receiving payment for her approved paid time off request.

34. On April 22, 2021, Employee #3, a business license technician, spoke with Capone and informed Capone she was called into Employee #4 office, who was the human resources manager, at Blanton's request. Blanton confronted Employee #3 about her telling Capone about Blanton discussing Capone's personal information openly with other Town employees. Blanton instructed Employee #3 to "act like Capone was her enemy."

35. The same day, Capone asked Chief Griffin how to file a complaint against Blanton because Blanton's workplace harassment and misconduct were now impacting her income, and

ELECTRONICALLY FILED - 2022 Jun 17 2:11 PM - CHARLESTON - COMMON PLEAS - CASE#2022CP1002740

Blanton was becoming retaliatory at her expense. The two discussed options, and Chief Griffin thought it was best that Capone talk to Benke.

36. On April 26, 2021, Capone spoke with Benke and Chief Griffin. Capone relayed all the information above to both and attempted to file a formal complaint against Blanton. Benke told Capone not to write an official complaint because it would need to go through Employee #4.

37. In this meeting, Benke told Capone he was worried Employee #4 would give Blanton a head's up about the complaint. Benke also reasoned that maybe Blanton was trying to be helpful and actually meant he just wanted to donate sperm. Benke said he didn't "know how [Blanton] would survive this." Chief Griffin reminded Benke that Blanton had also sent his staff a group text message asking if they wanted him to send a mold of his penis so they would not miss him while he was out of the office.

38. This meeting ultimately resulted in Benke informing Capone he would investigate the situation and would also speak with Employee #3, who had also made complaints about Blanton.

39. In the summer of 2021, after reporting Blanton to Benke, Capone asked Chief Griffin weekly for updates. Chief Griffin would follow up with Benke, who would tell him he was still working on the investigation. It became clear to both Chief Griffin and Capone that Benke was growing frustrated with their follow-ups on the investigation.

40. Meanwhile, Police Department sergeants continued to advocate to the Town for Capone to be promoted. The Town decided it was not a good time for promotions, despite the department being short staffed and in need of a competent sergeant.

41. On July 2, 2021, Capone again inquired on the progress of the investigation against Blanton. Employee #2 volunteered their opinion that Blanton seemed infatuated with Capone's

relationship with her wife and would ask sexual questions every time Employee #2 and Capone went into Blanton's office.

42. On June 10, 2021, Capone had a meeting with Benke. Essentially, Benke asked Capone whether she was afraid of Blanton and said, "[Blanton] is not an actual predator, right?" He also asked Capone if she could "take him," presumably meaning in a fight.

43. On July 10, 2021, Capone was informed that Benke, and Mayor O'Neil spoke with Blanton regarding his mistreatment and harassment of her. Blanton admitted to the insemination comments and to other comments that were sexual in nature.

44. On July 12, 2021, Capone met with Mayor O'Neil and Benke. In this meeting, Capone expressed she had no plans of terminating her employment with the Town, but she could not work with Blanton because he made her feel uncomfortable while at work. Capone also expressed her concerns about the bullying from the Town staff, possible retaliation, and the past comment about Blanton sending a mold of his penis to his staff. Blanton was told to keep the matter confidential.

45. On July 20, 2021, Benke called Capone to inform her the Town Council voted to suspend Blanton for three (3) days, to demote him, and to cut his pay. Benke mentioned he did not tell the Town Council about Blanton's sexual comments because he thought it would violate Capone's HIPPA rights and, instead, said an anonymous employee reported "inappropriate comments."

46. The next day, Capone called in sick after being notified Blanton spoke to his staff and alleged she was "after him" and that she was trying to obtain his phone records through a FOIA request. Blanton also told his employees that rather than admitting to a three (3) day suspension, he was working from home and could be reachable via email.

47. During a week in July 2021, Capone felt she needed to call in sick for the week because she felt like she was unable to work since she feared for her safety and the retaliation from Blanton and/or his staff, who had been acting cold toward her.

48. Following Capone using a week of her paid sick leave, she was out of paid sick days. Therefore, to avoid the fear of her safety and possible retaliation from Blanton, Capone required a formal doctor's note, detailing her symptoms, to secure paid leave.

49. On August 3, 2021, Capone's therapist wrote the Town a letter stating: "I have been seeing Amanda Capone Since October 2020. Recently, Amanda has reported inappropriate actions from another employee at her workplace. These inappropriate interactions have contributed negatively to Amanda's stress and anxiety levels. Without a reasonable resolution and support from Amanda's employer, it is difficult for Amanda to return to the workplace which further exacerbates her fear of feeling unsafe in this environment."

50. On August 4, 2021, Capone was informed that the Town was putting her on administrative leave until further notice, with no end date given. The Town stated they had demoted Blanton, meaning he would no longer be Capone's supervisor, but he would still be in charge of accounting and business licensing.

51. On October 18, 2021, Capone resigned from the Police Department.

52. All action committed and contained herein by Blanton, Benke, and Chief Griffin were committed within the scope of their respected official duties.

53. Capone has exhausted her administrative remedies, including asserting a formal in-house complaint with Benke and filing a formal complaint and attempted mediation with the U.S. Equal Employment Opportunity Commission ('EEOC").

ELECTRONICALLY FILED - 2022 Jun 17 2:11 PM - CHARLESTON - COMMON PLEAS - CASE#2022CP1002740

54. On June 10, 2022, Capone received her NOTICE OF RIGHT TO SUE from the EEOC.

## FOR A FIRST CAUSE OF ACTION
### Negligence

55. All of the above paragraphs are repeated and realleged as if they were repeated here verbatim.

56. Under the standard set forth in *Miller*, "an employer has a duty to promptly investigate complaint of sexual harassment." *Miller v. City of W. Columbia*, 322 S.C. 224, 471 S.E.2d 683 (1996).

57. The Town breached this duty by negligently failing to promptly investigate and attempt, in good faith, to resolve the ongoing sexual harassment of Capone by Blanton.

58. The Town never conducted a full, thorough, and good faith investigation into Capone and multiple other Town employees' complaints of sexual harassment by Blanton.

59. Capone's damages would not have occurred but for the Town's negligent failure to promptly investigate Capone's claims of sexual harassment.

60. It is foreseeable that Capone would suffer damages resulting from the Town's negligent failure to promptly investigate Capone's claims of sexual harassment.

61. Capone has suffered damages as a direct and proximate result of the Town's failure to promptly investigate her claims of sexual harassment.

## FOR A SECOND CAUSE OF ACTION
### Negligent Supervision

62. All of the above paragraphs are repeated and realleged as if they were repeated here verbatim.

ELECTRONICALLY FILED - 2022 Jun 17 2:11 PM - CHARLESTON - COMMON PLEAS - CASE#2022CP1002740

63. Blanton's actions and multiple occurrences of sexual harassment were committed, at all times, intentionally.

64. The multiple instances of sexual harassment at issue occurred while Blanton was on the premise of the Town and/or using the Town's chattel.

65. The Town knew of the necessity and opportunity for exercising control by way of Capone's complaints of sexual harassment and actual knowledge of multiple other Town employee complaints regarding Blanton's constant sexual harassment and discrimination on the basis of sex and sexual orientation in the Town's workplace.

66. Based off the Town's actual knowledge of Blanton's history of sexual harassment and discrimination on the basis of sex and sexual orientation, it was foreseeable that harm would come to Capone and other members of the Town's workforce.

67. Capone has suffered damages as a direct and proximate result of the Town's negligent supervision of Blanton.

## FOR A THIRD CAUSE OF ACTION
### Negligent Retention

68. All of the above paragraphs are repeated and realleged as if they were repeated here verbatim.

69. Based off the complaints of Capone and multiple other Town employees and supervisors, the Town knew Blanton was in a habit of misconducting himself in a manner dangerous to others.

70. Particularly, Blanton had a propensity, proclivity, course of conduct, and apparent infatuation with Capone being an openly gay woman, which put the Town on actual notice of Blanton's possible danger to Town employees, based off Capone and multiple other Town employees' complaints.

71. The Town was negligent in retaining, and continuing to retain, Blanton as an employee following the Town's actual knowledge of his propensity, proclivity, and course of conduct of sexual harassment and discrimination on the basis of sex and sexual orientation.

72. It is foreseeable that a Town employee would be harmed based off the Town's knowledge of Blanton's propensity, proclivity, and course of conduct of sexual harassment and discrimination on the basis of sex and sexual orientation.

73. Capone has suffered damages as a direct and proximate result of the Town's negligent retention, and continued retention, of Blanton as a Town employee.

### FOR A FOURTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

74. All of the above paragraphs are repeated and realleged as if they were repeated here verbatim.

75. Blanton intentionally and recklessly inflicted severe emotional distress and was substantially certain such distress would result from his repeated conduct of sexual harassment, misconduct, and discrimination on the basis of Capone's sex and sexual orientation.

76. Blanton's conduct was so extreme and outrageous that it exceeded all possible bounds of decency and can be regarded as atrocious and utterly intolerable in any civilized community.

77. Capone suffered severe emotional distress and physical distress as a direct result of Blanton's actions of repeated sexual harassment, misconduct, and discrimination on the basis of sex and sexual orientation against Capone.

78. Capone's emotional distress was so severe that no reasonable person could be expected to endure it, especially while at the workplace of a municipal organizations such as the Town.

79. Capone has suffered damages as a direct and proximate result of the Blanton's continuous intentional infliction of emotional distress against her.

## FOR A FIFTH CAUSE OF ACTION
### Retaliation under Title VII of the Civil Rights Act of 1964

80. All of the above paragraphs are repeated and realleged as if they were repeated here verbatim.

81. Capone engaged in a protected activity by filing a formal complaint against Blanton and notifying Benke of Blanton's repeated sexual harassment, misconduct, and discrimination on the basis of sex and sexual orientation.

82. The Town took adverse employment action against Capone by 1) not promoting her based on her competence, despite multiple sergeants' requests; 2) attempting to deny Capone's approved paid time off request; and 3) requiring Capone to take a leave of absence upon filing her complaint, all of which resulted in Capone's eventual resignation and reduced pay at her current place of employment.

83. A causal connection exists between Capone filing her complaint with the Town and her denial of a promotion, attempted disapproval of her approved paid time off request, and required leave of absence.

84. Capone has suffered damages as a direct and proximate result of the Town's clear retaliation against her resulting from her protected activity of filing a complaint against Blanton.

## FOR A SIXTH CAUSE OF ACTION
### Sexual Harassment

85. All of the above paragraphs are repeated and realleged as if they were repeated here verbatim.

86. Blanton engaged in conduct that was unwelcomed by Capone, which is classified as harassment.

87. Blanton's conduct was based on sex, sexual orientation, and his apparent infatuation with the fact that Capone is an openly homosexual woman.

88. Blanton's conduct toward Capone was so severe and pervasive it altered work conditions, required both Blanton and Capone's employment positions within the Town to be changed, and created an abusive environment for Capone which ultimately resulted in her resignation.

89. Blanton's conduct is imputable to the Town, as these events transpired while both Blanton and Capone were at the Town's place of work, and the Town had knowledge of Blanton's conduct.

90. Capone suffered damages as a direct and proximate result of Blanton's sexual harassment.

## FOR A SEVENTH CAUSE OF ACTION
### Discrimination under S.C. Code Ann. Section 1-13-80 (A)(1)

91. All of the above paragraphs are repeated and realleged as if they were repeated here verbatim.

92. The Town refused to promote Capone on the basis of sex, despite her clear competence as evidenced by multiple requests by current sergeants.

93. Further, while sexual orientation is not a protected class as sex, the fact that Capone is the only openly gay employee of the Town is what led to Blanton's apparent infatuation with Capone and, ultimately, led to her being discriminated against on the basis of her sex.

94. Capone suffered damages as a direct and proximate result of the Town's discrimination against her on the basis of sex.

## FOR AN EIGHTH CAUSE OF ACTION
### Wrongful Intrusion into Private Affairs

95. All of the above paragraphs are repeated and realleged as if they were repeated here verbatim.

96. Blanton repeatedly intruded upon Capone's privacy over the course of Capone's employment with the Town by consistently prying into Capone's personal life, including, without limitation to, Capone's relationship with her wife, Capone's attempts to have a child, and Capone's interest in other female Town employees.

97. Blanton's repeated intrusions concerned aspects of Capone personally, her home life, relationship with her family, personal and intimate relationship with her wife, and multiple communications one normally expects to be free from exposure to Blanton and the Town including, without limitation to, how Capone and her wife have sex, procreate, and unsolicited offers to assist in procreating.

98. Blanton's conduct was so outrageous and offensive that it would cause mental injury to a person of ordinary feelings and intelligence in the same circumstances as Capone.

99. Blanton's actions and course of conduct was intentional because they were done willingly, and Blanton both 1) desired the result of his conduct and 2) knew, or should have known, the results of his conduct would follow.

100. Capone suffered damages as a direct and proximate result of Blanton's multiple and consistent intrusions into her private affairs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment to be entered in her favor on all claims and that she be awarded judgment, actual damages, special damages, consequential damages, punitive

damages, attorneys' fees, costs, pre-judgment interest, and for any such other further relief as the Court may deem just and proper.

                Respectfully submitted,

                s/Clayton B. McCullough
                Clayton B. McCullough, Esq. (SC Bar No.13722)
                Forrest Lewis, Esq. (SC Bar No. 105525)
                McCULLOUGH KHAN, LLC
                2036 eWall Street
                Mount Pleasant, SC 29464
                (843) 937-0400
                (843) 937-0706 (fax)
                clay@mklawsc.com
                forrest@mklawsc.com

June 17, 2022
Mount Pleasant, South Carolina

ELECTRONICALLY FILED - 2022 Jun 17 2:11 PM - CHARLESTON - COMMON PLEAS - CASE#2022CP1002740